## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

ANTONIO LYNN FLUKER,

         *Plaintiff,*

v.

STEVEN WORPELL,

         *Defendant.*

_____/

Case No. 1:22-cv-12045
District Judge Thomas L. Ludington
Magistrate Judge Patricia T. Morris

## REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

For the following reasons, I **RECOMMEND** that the Court **DISMISS** Fluker's request for monetary damages only *sua sponte*, pursuant to 28 U.S.C. § 1915(e)(2) but that his Equal Protection and Substantive Due Process claims under the Fourteenth Amendment seeking injunctive relief be allowed to proceed.

### II.   REPORT

#### A.   INTRODUCTION

Judges and magistrates generally enjoy absolute immunity from suit. But this protection is not without limits. Only for judicial acts—acts which involve the adjudication of an individual's rights—can judges seek refuge behind this impregnable defense.

Magistrate Judge Steven Worpell agreed to conduct a wedding ceremony for Antonio Fluker, but after learning that Fluker was a pretrial detainee who intended to marry another man, Worpell backed out of the ceremony. Fluker then brought this civil rights action against Worpell.

1

Screening Fluker's complaint under 28 U.S.C. § 1915, the Court must confront two issues: whether solemnizing a marriage constitutes a judicial act, and if so, whether a judge who refuses to solemnize a pretrial detainee's homosexual marriage violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

## B.      BACKGROUND

Antonio Fluker is a criminal defendant in this Court, charged with wire fraud and money laundering.  (*United States v. Fluker*, Case No. 4:21-cr-20331, ECF No. 43).  Despite being detained since at least March 2020, Fluker and his fiancé of six years, Ricky Lynn Jones, obtained a marriage license from the Genesee County Clerk's Office on August 21, 2022. (*Compare id.* at ECF No. 11, *with Fluker v. Worpell*, No. 1:22-cv-12045, ECF No. 6, PageID.22).

Under Michigan law, couples interested in marriage must undergo a two-step process. Mich. Comp. L. § 551.2.  First, both individuals must submit a notarized application for a marriage license to the County Clerk.  *Id.* §§ 551.2, 551.101–102(1).  Unless either party is less than eighteen years of age, the parties need not apply in person.  *Id.* § 551.102(1).  Once the clerk receives the application, he or she must determine whether the parties are legally entitled to be married and issue a marriage license to the parties if there are no legal impediments.  *Id.*  This license remains valid for thirty-three days following the date of application, and during that time, the parties must solemnize their marriage before a valid officiant and at least two witnesses.  *Id.* §§ 551.9, 551.103a.  Only after the parties solemnize their marriage are they legally married.  *Id.* §§ 551.2–551.11.

2

Aware that their license would soon expire, Fluker and Jones asked Magistrate Judge Steven Worpell at the 80th District Court in Gladwin County to solemnize their marriage.  (ECF No. 6, PageID.22).  Judge Worpell initially agreed to conduct the ceremony and scheduled their wedding for September 2, 2022.  (*Id.*)  However, when Judge Worpell later learned that Fluker was a pretrial detainee who wished to marry another man, he backed out of the ceremony, explaining that he does not marry incarcerated individuals.  (*Id.*)

Fluker then brought a pro se civil action against Worpell in this court pursuant to 42 U.S.C. § 1983, alleging that Worpell violated his "right to marry" under the "Fourteenth Amendment."  (ECF No. 1, PageID.3, ECF No. 6, PageID.23).[1]  Fluker sued Judge Worpell in his official capacity only and requested declaratory relief, monetary damages, and a "preliminary injunction"[2] instructing Worpell to solemnize Fluker's marriage before the marriage license expires.[3]  (ECF No. 1, PageID.5; ECF No. 6, PageID.23).

## C.   LEGAL STANDARD

Plaintiff proceeds IFP, subjecting his claim to the screening standards in 28 U.S.C. § 1915(e)(2)(B) (2018).  Since 1892, federal courts have possessed statutory power to permit civil actions IFP.  *See Bruce v. Samuels*, 136 S. Ct. 627, 629 (2016).  This power ensures that indigent individuals have equal access to the judicial system by allowing them to proceed without advancing the litigation fees and costs.  *Flint v. Haynes*, 651 F.2d 970, 972 (4th Cir. 1981).

---

[1] On September 7, Fluker filed a document titled "Amended Statement of Claim."  (ECF No. 6).  This document appears to be a partial amendment to his original complaint, superseding only the portion of his original complaint under the heading "statement of claim."  (*Compare id.*, *with* ECF No. 1, PageID.12–13).

[2] The undersigned has addressed Fluker's motion for a preliminary injunction in a separate Report & Recommendation.

[3] In Fluker's criminal case, he filed a motion, similar to this civil action, in which he asks the Court to order the county jail to accommodate a marriage ceremony between him and his prospective spouse.  (*United States v. Fluker*, Case No. 4:21-cr-20331, ECF No. 67).

However, Congress recognized that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits." *Denton v. Hernandez*, 504 U.S. 25, 31 (1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)).  To counteract these incentives, Congress crafted a screening procedure which permits the court to *sua sponte* review the complaints of all plaintiffs proceeding IFP and dismiss any action which is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B).

When a plaintiff proceeds without counsel, the court must liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, even *pro se* complaints must satisfy basic pleading requirements.  *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).

The Supreme Court has established that "a complaint . . . is frivolous where it lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).[4]  A complaint is also frivolous and can be dismissed if it provides no basis for federal jurisdiction. *Carlock v. Williams*, 182 F.3d 916, 1999 WL 454880, at *2 (6th Cir. 1999) ("Since there is no basis for federal jurisdiction apparent on the face of Carlock's complaint . . . the district court properly dismissed the action as frivolous and for lack of subject matter jurisdiction."); *Humphries v. Various Fed. USINS Employees*, 164 F.3d 936, 941 (5th Cir. 1999) (citing caselaw

---

[4] The Court also held that the frivolousness analysis differed from the "failure to state a claim" analysis—a complaint might not be frivolous because it raises an arguable question of law but still fail to state a claim.  *Id.* When *Neitzke* was decided, the statute allowed screening of frivolous or malicious claims, but had not yet been amended to permit screening for failure to state a claim.  28 U.S.C. § 1915(d).  That amendment came in 1996. *See* Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, Title VIII, § 804, 110 Stat. 1321 (April 26, 1996).

for the proposition that a complaint is frivolous and can be dismissed on screening if the subject matter is outside the court's jurisdiction); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### D.    ANALYSIS

Liberally construing Fluker's complaint (ECF No. 1) and his Amended statement of claim (ECF No. 6), I suggest that he brings three constitutional claims against Worpell under § 1983. *See Erickson*, 551 U.S. at 94.  First, Fluker appears to bring a substantive   due  process  claim against Worpell, alleging that Worpell violated his right to marriage under the Due Process Clause of the Fourteenth amendment.  (ECF No. 6, PageID.23).  Fluker also seems to bring two distinct equal protection claims against Worpell, alleging that Worpell discriminated against him based on both his sexual orientation and his status as a pretrial detainee. (*See id.* at PageID.22– 23).  Indeed, while Worpell only stated that he would not marry Fluker because Fluker was "incarcerated," Fluker points out that shortly before Worpell backed out of the marriage ceremony, Worpell also learned that Fluker intended to marry another man.  (*Id.* at PageID.22). This information seems extraneous unless it is intended to show that Worpell's decision may have been motivated by Fluker's sexual orientation.

Additionally, while Fluker only requests a "preliminary injunction," I suggest that he also means to request a mandatory, permanent injunction, requiring Worpell to solemnize Fluker's marriage—even if that would require Fluker to obtain a new marriage license.[5]  There seems to

---

[5] Fluker does not maintain that he cannot obtain a new license after his current license expires, and Michigan does not appear to bar applicants from reapplying for marriage licenses if their original license expires.  Mich. Comp. L. §§ 551.2–551.111.  To do so, Fluker need only submit a new application and pay a twenty-dollar fee.  Mich. Comp. L. § 551.102(1).

be no apparent reason why—apart, possibly, from a mistaken belief that he cannot reapply for a new license—why Fluker would *only* desire preliminary injunctive relief.  And his request for declaratory relief indicates that Fluker is interested in compelling Worpell to solemnize his marriage even after the close of litigation.

For the following reasons, I suggest that Fluker states a plausible claim for relief under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, except to the extent that he requests monetary damages.

### 1.    Sovereign Immunity

Because Fluker sues Worpell in his official capacity only, his claims are barred by sovereign immunity insofar as he requests monetary damages.  The Eleventh Amendment to the United States Constitution provides that no citizen of the United States shall commence a suit against any state. U.S. Const. amend. XI; *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).  It is well established that a suit against a state officer in his or her official capacity is a suit against the entity he or she represents.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Worpell is a magistrate judge of a Michigan district court; thus, by suing Worpell in his official capacity, Fluker is effectively suing the State of Michigan.  *Dolan v. City of Ann Arbor*, 666 F. Supp. 2d 754, 765 (E.D. Mich. 2009) (holding that Michigan district courts, as arms of the State of Michigan, are protected by sovereign immunity); *see also Rodgers v. 36th Judicial Dist. Court.*, No. 10-11799, 2011 WL 3714592, at *4 (E.D. Mich. Aug. 24, 2011).

Accordingly, I suggest that under the Eleventh Amendment, this Court lacks subject matter jurisdiction over Fluker's official capacity claims against Worpell, insofar as Fluker requests monetary damages.  *See Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th

Cir. 1997) ("It is well established that § 1983 does not abrogate the Eleventh Amendment and that Michigan has not consented to the filing of civil rights suits against it in federal court."). However, sovereign immunity does not prohibit Fluker from seeking a mandatory injunction or declaratory relief.  Indeed, a plaintiff may seek declaratory or prospective, injunctive relief from a state official, even in his or her official capacity, where the "official's actions violate the constitution or federal law . . . ."  *Westside Mothers v. Haveman*, 289 F.3d 852, 860 (6th Cir.2002) (citing *Ex parte Young*, 209 U.S. 123, 148 (1908)); *see also S & M Brands Inc. v. Cooper*, 527 F.3d 500, 508 (6th Cir. 2008).

## 2.    Judicial Immunity

While sovereign immunity cannot bar Fluker from obtaining injunctive or declaratory relief, judicial immunity might.  Judicial officers (including magistrate judges, like Worpell) are immune from suits arising out of "their judicial functions."  *Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2012)).  This immunity is absolute, and it applies even where a judge acts "corruptly or with malice."[6]  *Leech*, 689 F.3d at 542.

There are only two exceptions to judicial immunity.  *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir. 1994).  First, judges are "not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Id.* (internal quotation marks omitted) (quoting *Mireles v. Waco*, 502 U.S. 9, 11 (1991)).  And second, judges are "not immune for actions" which, "though judicial in nature," are "taken in the complete absence of all jurisdiction."

---

[6] In *Pulliam v. Allen*, the Supreme Court held that judicial immunity only protected judges from suits for monetary damages.  466 U.S. 522, 541–42 (1984).  However, Congress later amended § 1983 to extend the reach of judicial immunity to suits for injunctive relief.  *Corsetti v. Hackel*, No. 10-12823, 2013 WL 2372284, at *21 n.6 (E.D. Mich. May 28, 2013).

*Mireles*, 502 U.S. at 12.  Because Michigan law expressly permits magistrate judges to solemnize marriages, and because I ultimately conclude that solemnization is not a judicial act, only the first of these exceptions is relevant here.  Mich. Comp. L. § 551.7.

Judicial immunity originated at common law as a means "to establish appellate procedures as the standard system for correcting judicial error" by "discouraging collateral attacks" against trial court judges.  *Forrester v. White*, 484 U.S. 219, 225 (1988).  American courts adopted this doctrine, recognizing that apart from "protecting the finality of judgments," judicial immunity served an additional, but equally important, purpose— "protect[ing] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Id.* (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 348 (1872)).  Recognizing these underlying purposes, the Supreme Court has long reasoned that "the 'touchstone' for the doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'"  *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 500 (1991) (Scalia, J., concurring in part and dissenting in part)).

Thus, when evaluating whether an act performed by a judge is judicial in nature, courts delineate between adjudicatory acts—where a judge exercises discretion in authoritatively deciding the private rights of individuals—and administrative, legislative, or executive acts. *Forrester*, 484 U.S. at 227; *see also Antoine*, 508 U.S. at 435–36.  Two factors are relevant to this determination: (1) whether the "function" is one that is "normally performed by a judge," and (2) whether the party or parties "dealt with the judge in his judicial capacity."  *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).  But the first factor, at most, serves as a helpful clue that

8

a function might be a judicial act.  "[I]mmunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches," and there are several functions which are commonly, if not exclusively, performed by judges which nonetheless do not constitute "judicial acts."  *Forrester*, 484 U.S. at 227 (emphasis in original).  For example, the promulgation and enforcement of a state's professional responsibility code, although performed exclusively by judges, is not a "judicial act," because it is not adjudicatory in nature.  *See Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719 (1980).

Likewise, courts have held that selecting jurors, terminating judicial staff, and transcribing court proceedings are not judicial acts because, as "essential" as these actions may be to "the very functioning of the courts," they do not involve "adjudicating private rights." *Forrester*, 484 U.S. at 228; *e.g.*, *Antoine*, 508 U.S. at 433–37; *Ex parte Virginia*, 100 U.S. 339, 348 (1879).  By contrast, judges who impose sanctions, rule on ex parte petitions, or instigate criminal proceedings when necessary to "preserve the integrity of the judicial system," all act in their judicial capacity.  *E.g.*, *Stump*, 435 U.S. at 362; *Brookings*, 389 F.3d at 618–23; *Morrison v. Lipscomb*, 877 F.2d 463, 465 n.2 (6th Cir. 1989).

Although it has not addressed whether solemnization is a judicial act, the Sixth Circuit has implied that under some circumstances, issuing a marriage license can constitute a judicial act.  In *Brookings v. Clunk*, the Sixth Circuit held that a state court judge committed a judicial act by "swearing out a criminal complaint" against an individual who had filed three fraudulent applications for a marriage license in his court.  389 F.3d at 622.  Each time he applied, the applicant lied about his legal sex, purporting to be a biological male when he had actually been born as a female before undergoing a sex reassignment surgery.  *Id.* at 616.  The Sixth Circuit

recognized that instigating a criminal prosecution generally was not a judicial act because it does not involve the adjudication of private rights.  *Id.* at 618, 621.  However, the Court reasoned that swearing out the complaint was necessary to prevent further frauds against the court which could have threatened the judge's "judicial independence in future cases."  *Id.* at 621 n.1.  Allowing the applicant to continue defrauding the court would have jeopardized "the integrity of the judicial decision-making process."  *Id.*

In reaching its holding, the *Brookings* Court appeared to assume that the evaluation of a marriage license application was a judicial act.  After all, the Court found that the instigation of the criminal prosecution was a judicial act *only* because it protected the judge's ability to independently adjudicate "future cases."  *Id.* at 620–21.  But at no point did the *Brookings* Court reason that evaluating marriage licenses was categorically a judicial act; quite the opposite, the Court's rationale rested on the premise that the judge engaged in an adjudicatory "decision making process" when he considered the marriage license applications.  *Id.* at 620, 621 n.1.

Other courts have clarified that whether the issuance or denial of a marriage license constitutes a judicial act depends on the judge's latitude to evaluate the application and exercise discretion in either approving or denying the application.  In *Strawser v. Strange*, for example, the Southern District of Alabama held that in Alabama, the issuance of marriage licenses is not a judicial act because it is "purely ministerial."  105 F. Supp. 3d 1323, 1328 (S.D. Ala. May 21, 2015).  The court explained that under Alabama law, judges had no discretion to consider the merits of an application and choose whether to issue a marriage license.  *Id.*  Conversely, in *Harris v. United States*, the Northern District of Ohio held that under a statute which allowed judges to review applications for "legal impediments" and reject defective applications, the

issuance of marriage licenses was a judicial act. *Harris v. United States*, No. 4:16CV270, 2017 WL 3594601, at *8 & n.1 (N.D. Ohio Aug. 21, 2017); Ohio Rev. Code. § 3101.05(A).[7]

Here, of course, Judge Worpell did not deny Fluker a marriage license, he declined to solemnize Fluker's marriage. (ECF No. 6, PageID.22). But the same principles apply— solemnization is only a "judicial act" if it involves a "discretionary" adjudication of private rights. *Antoine*, 508 U.S. at 435. Michigan law authorizes state magistrate judges to solemnize marriages. Mich. Comp. L. § 551.7(1)(b). And to solemnize a marriage, a magistrate need only be present, along with two other witnesses, while the parties to be wed "solemnly declare" that they will "take each other as" spouses. *Id.* § 551.9. Thus, the statute grants magistrate judges no discretion while conducting a wedding ceremony. *Id.* They cannot review the validity of the parties' marriage, or otherwise "adjudicate" the parties' rights. *Id.*; *see Antoine*, 508 U.S. at 435; *cf. Strawser*, 105 F. Supp. 3d at 1328. A marriage ceremony is just that—ceremonial. *City of St. Louis v. Sommers*, 148 Mo. 398, 398 (1899) ("The solemnization of a marriage is in no sense a judicial act.").

Moreover, while not dispositive, the fact that Michigan permits numerous individuals besides judges to solemnize marriages suggests that solemnization is not a judicial act. *See Stump*, 435 U.S. at 362 (reasoning that a judge committed a judicial act because, among other reasons, the act was one "normally performed only by judges"). Mayors, county clerks, and

---

[7] The *Harris* court actually justified this conclusion on broader grounds, reasoning that the issuance of a marriage license was a judicial act because in Ohio, judges, rather than court clerks, issued marriage licenses. *Harris*, 2017 WL 3594601, at * 8 & n.1. However, judicial immunity is defined "not by the person to whom it attaches," but "by the *functions* it protects and serves . . . ." *Forrester*, 484 U.S. at 227 (emphasis in original). For that reason, any official who performs a judicial function, even if he or she is not a judge, is entitled to judicial immunity. *Quatkemeyer v. Ky. Bd. of Med. Licensure*, 506 F. App'x 342, 345–46 (6th Cir. 2012). Thus, the mere fact that Ohio law leaves this function to individuals other than judges is not a sufficient ground to that the function is not a judicial act.

religious ministers are all authorized by statute to solemnize marriages.  Mich. Comp. L. §

551.7(1)(f)–(j).  Accordingly, I suggest that Judge Worpell's refusal to solemnize Fluker's

marriage was not a judicial act.

### 3.  Equal Protection and Substantive Due Process

Because Worpell cannot take shelter from Fluker's requests for declaratory and injunctive

relief behind the walls of absolute judicial immunity, I will address the merits of Fluker's § 1983

claims.  And for the following reasons, I suggest that Fluker states a plausible claim for relief on

the merits of his Equal Protection and Substantive Due Process claims.

The Equal Protection clause of the Fourteenth Amendment provides that no State shall

"deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend.

XIV, § 1.  The clause "embodies a general rule that States must treat like cases alike" and it

prohibits states from discriminating between various classes of individuals without adequate

justification.  *Vacco v. Quill*, 521 U.S. 793, 799 (1997); *see Massachusetts Bd. of Retirement v.

Murgia*, 427 U.S. 307, 311–15 (1976).  Whether the government's justification is adequate

depends on the classes of individuals the government distinguishes between.  *Ondo v. City of

Cleveland*, 795 F.3d 597, 608 (2015).  Where the government draws distinctions based on

suspect classifications (race, alienage, or national origin) or quasi-suspect classifications (gender

and illegitimacy), the government's discrimination is held to heightened scrutiny, and will only

be upheld if the action is "narrowly tailored to achieve a compelling public interest", in the case

of suspect classifications, or "substantially related to achieving an important public interest," in

the case of quasi-suspect classifications.  *Id.*  For all other classifications, the government need

only possess a "rational basis" for its discrimination; that is, the challenged action must be

rationally related to some legitimate government objective. *Id.*; *see also Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006). However, even if the government discriminates against a class of people who do not belong to "suspect" or "quasi-suspect" classes, the government's action must still pass strict scrutiny if its distinction between these classes affects a fundamental right. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

The Fourteenth Amendment also provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. This provision not only guarantees procedural safeguards, but it also provides individuals with substantive rights. *LA Alliance for Human Rights v. City of Los Angeles*, No. CV 20-02291, 2021 WL 1890782, at *4 (C.D. Cal. May 11, 2021). States may not infringe on individual liberty interests without adequate reason. And like the Equal Protection Clause, the degree of protection depends on the nature of the right at issue. *United States v. Hughes*, 632 F.3d 956, 962 (6th Cir. 2011). If the right is "fundamental," then courts will apply strict scrutiny. *Id.*; *see also Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). But for all other interests, the government's deprivation of an individual's liberty need only rationally further a legitimate government interest. *Hughes*, 632 F.3d at 962.

The pleading requirements for equal protection and substantive due process claims depends on the applicable level of scrutiny. The government only carries the burden of proving that its action is justified when the challenged act is held to heightened scrutiny. *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 693–94 (6th Cir. 2016) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)); *Jana-Rock Const., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 205 (2d Cir. 2006). But where the challenged action is subject to rational

basis review, the plaintiff, not the government, carries the burden of establishing that the action is arbitrary or motivated by animus.  *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018); *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010).

Thus, "[t]o state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'"  *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).  Likewise, to plausibly allege a substantive due process claim, a plaintiff must either allege a deprivation of a fundamental liberty interest or, alternatively, a deprivation of any liberty interest that lacks a rational basis.  *See Courser v. Allard*, 969 F.3d 604, 616 (6th Cir. 2020) (citing *Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019)); *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018); A*RJN #3 v. Cooper*, 517 F. Supp. 3d 732, 746 (M.D. Tenn. 2021).

In other words, although the government's purpose for discriminating between classes of individuals or for burdening individual liberty is always at issue, for pleading purposes, a plaintiff need only allege that the government's justifications are inadequate if the challenged law or action is subject to rational basis review.  *See Swiercewicz v. Sorema*, 534 U.S. 506, 511–12 (2002) (reasoning that a plaintiff need not "plead more facts than he may ultimately need to prove to succeed on the merits").  To do so, a plaintiff must either allege that the government's action was motivated by "animus" or the plaintiff must plead "facts sufficient to overcome the presumption of rationality that applies to" the government's actions by "plead[ing] facts that plausibly negate the defendant's 'likely'" valid purposes.  *Andrews v. City of Mentor*, 11 F.4th 462, 476–78 (2021).

14

But here, Fluker never discusses any likely non-discriminatory reasons for Judge Worpell's refusal to solemnize his marriage, nor does he allege that Judge Worpell was motivated by animus. (ECF Nos. 1, 6). Thus, his pleadings are only sufficient if his claims are subject to strict scrutiny or if there are no "likely" valid purposes for Worpell's decision which are discernable from Fluker's complaint.

Fortunately for Fluker, his claims are not subject to rational basis review, and therefore his complaint need not address Worpell's possible justifications for his action. To the extent that Fluker alleges that Worpell discriminated against him based on his status as a pretrial detainee, this claim is subject to strict scrutiny. While Fluker's status as a pretrial detainee is not a suspect classification, Worpell's alleged discrimination, based on this classification, burdens Fluker's fundamental right to marriage. *Obergefell v. Hodges*, 576 U.S. 644, 664, 675–76 (2015) ("[T]he right to marry is fundamental under the Due Process Clause."); *see Center for Bio-Ethical Reform, Inc.*, 648 F.3d at 379.

The same is true of Fluker's claims that Worpell violated the Equal Protection and Due Process Clauses by declining to solemnize Fluker's wedding because it involved two individuals of the same sex—but for somewhat more complex reasons. In *Obergefell v. Hodges*, the Supreme Court recognized that marriage, whether homosexual or heterosexual, is a fundamental right, and the Court explained that states violate equal protection and substantive due process by "exclud[ing] same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." 576 U.S. at 675–76.

The Sixth Circuit has since explained that under *Obergefell*, states violate this fundamental right not only when they prohibit same sex couples from marriage, but also when

they simply frustrate a same sex couple's right to marriage—even if the couple is not actually prevented from obtaining a marriage. *Ermold v. Davis*, 936 F.3d 429, 436 (6th Cir. 2019). In *Ermold v. Davis*, a county clerk stopped issuing marriage licenses to all applicants just a day after the *Obergefell* decision, finding homosexual marriage morally objectionable. *Id.* at 432. On appeal to the Sixth Circuit, the Court rejected the clerk's argument that she did not violate due process because any prospective applicant could have easily obtained a marriage license from another county. *Id.* at 436. The Court explained that "[a]ll government officials must respect *all* constitutional rights." *Id.* (emphasis in original). After all, unlike many other rights which only *restrict* the government, the right to marriage requires the state's assistance. Individuals who wish to exercise their right to marriage are dependent on the state's cooperation, and as such, the state bears some responsibility for assisting individuals in their efforts to obtain a marriage.

Here, solemnization, like the issuance of a marriage license, is necessary for Fluker to obtain a valid marriage. Mich. Comp. L. § 551.2. Like the county clerk in *Ermold*, Judge Worpell cannot frustrate Fluker's attempts at obtaining a valid marriage, even if his refusal to solemnize Fluker's marriage did not actually prevent Fluker from marrying his fiancé. *Cf.* 936 F.3d at 436. As a government official, Worpell "must respect" Fluker's right to marriage. *See id.*

However, *Obergefell* did not frame its discussion in the usual "tiers-of-scrutiny analysis" applied to most other equal protection and substantive due process claims. *Id.* at 437. The Court simply held that prohibiting homosexual marriage violated equal protection and substantive due

16

process, "without ever asking what government interest that refusal served or examining the relationship between the refusal and any proffered interest(s)." *Id.*

Perhaps there is room to argue that the *Obergefell* court implicitly applied a strict scrutiny analysis (at least in its substantive due process discussion), but that is not how the Sixth Circuit has interpreted the opinion. *Id.* In the Sixth Circuit's view, *Obergefell* "jettison[ed]" the "tiers of scrutiny" analysis where an official intentionally infringes on an individual's right to marriage on the basis of his or her sexual orientation. *Id.* In these cases, the government's justification for obstructing homosexual marriage, is irrelevant. *Id.*

Accordingly, here, Fluker's complaint need not address any possible justifications for Fluker's refusal to solemnize a homosexual marriage. *See id.* These justifications simply are not relevant because Fluker adequately alleges that Worpell refused to solemnize Fluker's marriage because of his sexual orientation. Indeed, Fluker alleges that Worpell initially agreed to solemnize his marriage, but that Worpell reneged on this agreement once he learned that Fluker was a pretrial detainee who wished to marry another man. (ECF No. 6, PageID.22). Although it is not certain whether Worpell's change of heart was motivated by Fluker's detainment, his sexual orientation, or both, Fluker's complaint, at the very least, alleges discrimination based on his sexual orientation "beyond a speculative level." *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *cf. Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

Additionally, Fluker's status as a pretrial detainee does not require him to rebut any possible, valid purposes for Worpell's decision, at least in his complaint.  In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that state officials could infringe on a pretrial detainee's[8] constitutional rights, provided that doing so furthered some "legitimate[,] penological interest[]."  *Turner*, 482 U.S. at 89.  Under this standard, the prisoner generally carries the burden of disproving the validity of a government action.  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  Although they share similarities, *Turner*'s "reasonableness" test is distinct from the rational basis test applied in many equal protection and substantive due process cases. *Compare id.* at 89–91, *with Hughes*, 632 F.3d at 962.  But because the *Turner* test places the burden on the prisoner, rather than the state, the prisoner must identify and rebut any valid objective the government is "likely" to raise.[9]  *See Andrews*, 11 F.4th at 476–78.  *See generally Overton*, 539 U.S. at 132.

However, *Turner* only applies where the government can assert a legitimate, *penological* interest.  *United States v. Min*, No. 1:22-cr-00017-HAB-SLC, 2022 WL 492996, at *1–2 (N.D.

---

[8] Although *Turner* only addressed the rights of prison inmates, the Court has since recognized that *Turner* applies equally to pretrial detainees.  *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012).

[9] Many courts have held that under the *Turner* test, the government holds the initial burden of identifying legitimate, penological interests.  *E.g.*, *Brown v. Davis*, No. 1:18-cv-812, 2020 WL 8474759, at *5 (W.D. Mich. Nov. 12, 2020).  To hold otherwise, these courts reason, would require plaintiffs to "hypothesize any number of potential legitimate" objectives to survive a motion to dismiss.  *Figel v. Overton*, 121 F. App'x 642, 646 n.2 (6th Cir. Feb. 4, 2005).  And for that reason, courts have held that a plaintiff need not allege that the government's conduct is unreasonable to survive dismissal at the pleading stage.  *E.g.*, *Palmore v. Hornberger*, 813 F. App'x 68, 71 (3d Cir. 2020).  However, in *Andrews*, the Sixth Circuit found this logic unconvincing, reasoning that while a Plaintiff should not have to anticipate and rebut every possible legitimate, government objective, the Plaintiff must, at the very least, rebut those justifications that the government is "likely" to raise.  11 F.4th at 476–78.  Thus, the Court did not find it necessary to completely shift the burden of proof to the government to identify valid objectives.  *Id.*  While *Andrews* dealt specifically with the rational basis test in an equal protection claim, its reasoning is equally applicable under the *Turner* test.  *See id.*

Ind. Sept. 7, 2022) ("The Government may only burden [the right to marry] if doing so relates to a legitimate penological interest, specifically, the safety, security, and efficient management of the jail."); *see also United States v. Bailey*, No. 1:09-CR-176, 2010 WL 711819, at *1 (E.D. Tenn. Feb. 23, 2010).  Indeed, the Court constructed *Turner*'s reasonableness test to strike a balance between prisoners' constitutional rights and the practical difficulties of operating prisons.  482 U.S. at 85.  Thus, Worpell can only take advantage of the more deferential *Turner* standard if he can assert that his actions furthered a legitimate and *penological* objective.

For pleading purposes, then, Fluker need only address any "likely" justifications that further a valid, penological objective, not just any governmental objective.  And here, there are no "likely" penological justifications for Worpell (who is a magistrate judge, not a prison official) to have refused to solemnize Fluker's marriage.  *Andrews*, 11 F.4th at 476–78.  To be sure, there do appear to be some possible justifications for Worpell's action, such as logistical issues involved with Fluker's marriage or general concerns that marrying a criminal defendant could allow the defendant (or more accurately, the defendant's spouse) to take advantage of spousal immunity at the detainee's trial.  *See Min*, 2022 WL 4092996, at *2.  But these "likely" justifications do not advance penological objectives.  *Id.*  Thus, *Turner*'s reasonableness test would not apply, and Fluker need not address these possible, legitimate objectives in his complaint.

Accordingly, I suggest that Fluker states a plausible claim for relief under the Equal Protection and Due Process clauses of the Fourteenth Amendment.

## III.   CONCLUSION

For these reasons, I recommend that the Court **DISMISS** Fluker's request for monetary damages only but that his Equal Protection and Substantive Due Process claims under the Fourteenth Amendment seeking injunctive relief be allowed to proceed.

## IV.   REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   A party may respond to another party's objections within 14 days after being served with a copy."   Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).   The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.   *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.   Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.   Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.   Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).   The response must specifically address each issue raised in

20

the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 21, 2022                    S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge